## GEORGIA PACKING CO. et al. v. MAYOR, ETC., OF CITY OF MACON.

(Circuit Court, S. D. Georgia, W. D. August 2, 1893.)

CONSTITUTIONAL LAW—INTERSTATE COMMERCE—ORDINANCE—LICENSE.

An ordinance allowing persons selling meat of their own raising, to do so when and where they please, without license, and imposing on other meat dealers restrictions as to the time and place of selling, and the amount that may be sold, and requiring them to pay a license tax, is unconstitutional, as discriminating against interstate commerce, since it prevents dealers in meat raised in other states from competing on equal terms with those dealing in meat raised in the neighborhood.

Suit by the Georgia Packing Company, W. L. Henry, and others against the mayor and council of the city of Macon to enjoin the

enforcement of a city ordinance.   The averments of the bill are those following:

The complainants are wholesale and retail butchers in the city of Macon, in this district. They supply meats to the people of Macon and the surrounding country, dealing exclusively in dressed meats. They do not slaughter. Five-sixths of the meats they furnish their customers are cattle reared in western states, killed and dressed there, and shipped in refrigerator cars to Macon. These are of a better quality than the meats obtained in the country contiguous to Macon, and, for that reason, the complainants state, would naturally be regarded with more favor by the public, if the complainants had the equal protection of the laws. But complainants insist that this is not the case, for the mayor and council of the city of Macon are depriving them of the equal protection of the laws, and of due process of law, and of the right they have to conduct their business conformably to law. The gravamen of the complaint is that on the 2d day of June, 1888, certain market regulations were enacted for Macon. Market hours were prescribed, as follows: In winter, from daylight until 10 o'clock. In summer, from 3 a. m. to 9 a. m. By the municipal law, winter begins October 1st, and summer April 1st; but on Saturdays the market house is open from 3 o'clock p. m. to 8 o'clock p. m. in winter, and 9 o'clock in summer. These regulations further provide that it is unlawful to sell or offer for sale any meats on the streets or elsewhere in the city of Macon during said market hours, and heavy penalties are prescribed for a violation of this rule. Stalls are rented in the market, but none for a sum less than $150 per annum, but, although a butcher may rent a stall, yet his business is practically destroyed, for the ordinance provides that no person shall be permitted to buy more at the market than is necessary for the use of his or her family, except during the last hour of the market hours; and, further, that no person shall sell, or contract to sell, to any one, any article of produce or meat which is to be delivered outside of the market building, after market hours. Not only, therefore, is complainants' business cut off elsewhere during the market hours, but even as renters of stalls they claim they are so hindered and limited as to prevent them from selling meats in any considerable amount to those who are willing to buy. It is further provided by the market ordinances that all persons not renting a stall at the market for the sale of meat, and who shall sell any kind of meat on the streets of the city of Macon, at any time during the day or night, shall pay a license tax of $500 per annum, said license to be paid in advance, provided this section "shall not apply to farmers bringing into the city for the purpose of sale the flesh of any animal raised by themselves, after market hours." By this last clause we may safely presume that it is meant it shall not apply to farmers bringing into the city, for the purpose of sale after market hours, the flesh of any animal raised by themselves. It is further provided that after the expiration of market hours every person having any product or article for sale shall remove the same from the market place. On account of this last provision the complainants complain that they are forced to haul their meats to and from the market at great trouble, expense, and annoyance; that, on account of the restrictions and hindrances above mentioned, although the market hours constitute the principal portion of the day, when the people have ordinarily been accustomed to make their purchases of meat, yet the sales at the market do not constitute one-half of the sales at retail made after market hours at the complainants' respective places of business elsewhere in the town, so that a large part of their capital and time is wasted during market hours; that the ordinance further provides that a license shall be imposed on butchers or others who have no stall in the market, and who shall sell from any shop or wagon (other than nonresidents selling meat of their own raising), and no license shall be issued for less than $500. This, it is alleged, is a discrimination in favor of the producers of meat raised in the country tributary to Macon, and against meat producers who market their products in the western markets, and ship them for sale to Georgia.

The license tax, exclusive of the market ordinance, for the year 1893, upon wholesale dealers in meat, selling to the trade only, is $25. Complainants

aver that the wholesale meat trade in Macon handles western meats only. There is not enough meat produced in the country around Macon to create a wholesale business, and the tax operates to put a burden upon interstate commerce, and to give an undue advantage to dealers in meats raised near Macon. If the complainants should not rent a stall in the market house, under these ordinances they must pay a license of $500, even though they sell only after the market hours are over; while farmers from the surrounding country may retail meats brought into the city without any license whatever. The market ordinance, so far from undertaking to prevent the sale of meat on the streets of the city of Macon outside of market hours, expressly recognizes such sales. It is not, therefore, an ordinance intended to prevent the selling of meats on any particular street or in any particular locality. Nor does it provide for the inspection of meats elsewhere than at the market, and in point of fact the bill alleges the officials of the city have at no time undertaken to inspect meats elsewhere than in the market house. It is, then, not an ordinance, made for the protection of health, or for the inspection of meats, or for compelling the sale of meats in any particular locality, which, it is conceded, might be done under the exercise of the police power, but that, under the guise of police regulation, it is an ordinance wholly for the collection of a revenue. That, as such, it is in violation of the constitution of the state of Georgia and of the United States, in that it prescribes a cheaper license tax for those who sell in the market, and at their regular places of business, than for those who sell at their regular places of business, and no tax at all for farmers selling in the city after market hours, while handlers of western meats, not stall holders, must pay a tax of $500 to sell in the city after market hours. The constitution of the state of Georgia provides that "all taxation shall be uniform upon the same class of subjects." The constitution of the United States provides that "the citizens of the different states shall be entitled to the equal protection of the laws."

One of the complainants, W. L. Henry, has already been arrested for offering wholesome western meats for sale at his place of business, and selling during market hours, and was tried before the recorder of the city of Macon on the charge that he had sold meat at his place of business during the market hours, and was fined $25 and costs. This was appealed to the supreme court of the state, which court held that the ordinance was valid. 18 S. E. 143. The mayor and council of the city of Macon threaten to continue to arrest and fine complainants every time they undertake to sell or offer for sale, during market hours, any meats, at their said places of business. Complainants further aver that they will each be damaged in very large amounts, exceeding the sum or value of $2,000, exclusive of costs. The bill prays that the court will grant a writ of injunction perpetually enjoining and restraining the defendants, their clerks, attorneys, agents, servants, and employes from enforcing or endeavoring to enforce against complainants any penalty provided in said ordinances for selling or offering for sale any of said meats at their respective places of business or elsewhere in the city of Macon otherwise than at said market house, or from selling their meats at any time during said market hours; and be further enjoined from collecting or attempting to collect the license fee fixed by said ordinances for the sale of meats elsewhere than in said market house; and, further, from interfering with complainants for selling at any time during market hours such meats as they may have to offer for sale to all persons who may there desire to buy, and that said market ordinances may be decreed to be unconstitutional and void. They ask for a provisional injunction pendente lite.

The mayor and council of the city of Macon demur to the bill for want of jurisdiction in this court upon the ground that all the parties are citizens of the state of Georgia, and further because it does not appear that a question is raised depending upon the violation of any part of the constitution of the United States; and they answer that they have the right to regulate the selling of meat in the city of Macon, and to confine the sales thereof to the market house in said city during market hours. They further answer that they have the right to fix a license for the sale of meats and other articles in said city. They deny that the effect of the licenses so fixed by them in any way violates the constitution or the statutes of the United States.

No preliminary injunction was granted, and, the facts not being in dispute, the court, after argument, took under advisement the matters presented by the bill, the answer, and the demurrer.

Marion Erwin, for complainants.
R. W. Patterson, for defendants.

SPEER, District Judge (after stating the facts). It will be observed from the averments of the bill that there is no attempt to prohibit the sales of meat, elsewhere than in the market house of the city. The ordinances in question, therefore, are not directed towards the avoidance of green grocers and butcher shops. It cannot, we think, be denied that it is within the power of the city to fix one or more localities for the sale of meats. This may be done to facilitate inspection, but, since, by permission of the city, a very large amount of the meat is sold at the butcher shops and places of business elsewhere than in the market house, it is evident that the prohibition of sales during market hours at such places is not intended to prevent sales of uninspected meat. It is true, in point of fact that the city authorities do not inspect meats except at the market house, yet the ordinance authorizes them so to do. After providing that "no person shall sell any article not wholesome for food," it provides that "the clerk and inspector shall seize any such article he may find in market, and cause it to be destroyed, and the offender shall be punished," etc. The meaning of the word "market" in this sense cannot be "market house," but it means all articles of food offered for purchase or sale in the city. The city law, therefore, expressly authorizes the maintenance of butcher shops at any other place in the city, and further provides for the inspection of meats at such places. It cannot, then, be satisfactorily argued that these regulations are made either to compel the concentration of the meat business at the market house or to facilitate the inspection of meats. If, in order to facilitate inspection, the ordinance had expressly forbidden the sales of meat in the city elsewhere than at the market house, it might not have been difficult to sustain its constitutionality, even though it might have gravely interfered with interstate commerce. Such an ordinance would seem to be within the legitimate police power of the city. Slaughterhouse Cases, 16 Wall. 36; Butchers' Union Slaughterhouse Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 746, 4 Sup. Ct. 652. But, the ordinance not being of this character, the argument in its support, based upon that theory, must logically fail. Vide opinion of Mr. Justice Harlan in Minnesota v. Barber, 136 U. S. 329, 10 Sup. Ct. 862. Vide, also, Spellman v. New Orleans, 45 Fed. 3; Ex parte Kieffer, 40 Fed. 399.

It is not disputed that the business conducted by complainants is almost entirely that of selling meats raised in western states. These meats are transported to Macon and stored and offered for sale by means of the refrigerator apparatus. Complainants, thus engaged, must, in obedience to the ordinance, rent a stall in the market, and pay $150 therefor. They must, if engaged as wholesale dealers, also pay a license tax of $25 for the privilege of carrying on their business. From these burdens one who deals in meats pro-

duced in the surrounding country, is wholly exempt. Not only is this true, but in the most important hours for the purpose, during the day, the complainants are denied the right of making sales of any amount, for the reason that their places of business elsewhere than in the market house must be closed, and in the market house they are permitted to sell to any one person no more than enough for consumption in one day. While this is true, the producers of meat in this state may sell before and after market hours any amount they please, without the imposition of any tax or license charge whatever. It cannot be denied that the effect of this discrimination operates severely against the sale of meat produced in other states, and, whatever may be the power of the city government to discriminate between the producers of meat in the surrounding country and those who sell the same meat in the city, they have no power to make a regulation which operates in favor of home products and against the production of other states, and such regulations are in contravention of the constitution of the United States. Nor does it matter how such regulations are denominated, or how they are expressed. In the case of Welton v. Missouri, 91 U. S. 275, it was declared by the supreme court that a license tax required for the sale of goods is, in effect, a tax upon the goods themselves; and, further, that the statute of Missouri, which required the payment of a license tax from persons who deal in the sale of goods, wares, and merchandise which are not the growth, produce, or manufacture of the state, by going from place to place to sell the same in the state, and requires no such license tax from persons selling in a similar way, goods which are the growth, produce, or manufacture of the state, is in conflict with the power vested in congress to regulate commerce with foreign nations and among the several states; and further that this power protects property "which is transported as an article of commerce from foreign countries, or among the states, from hostile or interfering state legislation until it has mingled with, and become a part of, the general property of the country, and protects it even after it has entered a state from any burdens imposed by reason of its foreign origin." The decision itself was pronounced by that venerable and illustrious jurist, Mr. Justice Field, who for years has devoted his strong powers to the unswerving defense of what he has deemed the rights of the states. "It will not be denied," he declares, "that that portion of commerce with foreign countries and between the states which consists in the transportation and exchange of commodities is of national importance, and admits and requires uniformity of regulation. The very object of investing this power in the general government was to insure this uniformity against discriminating state legislation. The depressed condition of commerce, and the obstacles to its growth, previous to the adoption of the constitution, from the want of some single controlling authority, has been frequently referred to by this court in commenting upon the power in question. 'It was regulated,' says Chief Justice Marshall, in delivering the opinion in Brown v. Maryland, 'by foreign nations, with a single view to their own interests; and our disunited efforts to counteract their restrictions

were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties; but the inability of the federal government to enforce them became so apparent as to render that power in a great degree useless. Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control of this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the federal government contributed more to that great revolution which introduced the present system than the deep and general conviction that commerce ought to be regulated by congress.' 12 Wheat. 446." He continues: "The power of the state to exact a license tax of any amount being admitted, no authority would remain in the United States or in this court to control its action, however unreasonable or oppressive. Imposts operating as an absolute exclusion of the goods would be possible, and all the evils of discriminating state legislation favorable to the interests of one state and injurious to the interest of other states and countries which existed previous to the adoption of the constitution might follow, and the experience of the last fifteen years shows would follow, from the action of some of the states." What a state may not do, it may not authorize a city to do. Mr. Justice Miller, in his luminous and valuable lectures on the Constitution, upon exhaustive consideration of authorities, expresses the same conclusion. Miller, Const. pp. 433–473, Lecture 9.

In the case of Voight v. Wright, 141 U. S. 62, 11 Sup. Ct. 855, the supreme court passed on this state of facts: The state of Virginia had enacted a statute which provided that all flour brought into the state and offered for sale therein must be reviewed, and have the Virginia inspection marked thereon, and imposing a penalty for offering for sale without such review or inspection. The court held this to be repugnant to the commerce clause of the constitution, because it is a discriminating law, requiring the inspection of flour brought from other states, when it is not required for flour manufactured in Virginia.

In the case of Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213, Mr. Justice Harlan, delivering the opinion of the court, remarked:

"Undoubtedly a state may establish regulations for the protection of its people against the sale of unwholesome meats, provided such regulations do not conflict with the powers conferred by the constitution upon congress, or infringe on those granted and secured by that instrument. But it may not, under the guise of exerting its police powers, enact inspection laws, and make discriminations against the products and industries of some states in favor of the products and industries of its own or other states. The owner of the meats here in question, although they were from animals slaughtered in Illinois, had the right, under the constitution, to compete in the markets of Virginia upon terms of equality with the owners of like meats from animals slaughtered in Virginia or elsewhere within one hundred miles from the place of sale. Any regulation which, in terms or by its necessary operation, denies this equality in the markets of the state, is, when applied to the people and the products or industries of other states, a direct burden upon commerce among the states, and therefore void."

Of this case we may say, as was said of it by Justice Bradley, that "it is unnecessary to prolong the discussion or to cite further authorities." Voight v. Wright, supra.

It is clearly evident that the local regulations of the city of Macon, imposing a tax of $500 or $150 and other restrictions on the selling of western meats, and nothing of the kind on the sale by producers of their own meats raised in this state, by their necessary operation deny to the former equality in the markets of this state, and are a direct burden upon commerce among the states, and are therefore void. See, also, Railroad Co. v. Husen, 95 U. S. 465.

The language of the ordinance is:

"All persons not renting a stall at the market for the sale of meat, and who shall sell any kind of meat on the streets of the city of Macon at any time during the night or day, shall pay a license tax of five hundred dollars per annum, such license to be paid in advance: provided, this section shall not apply to farmers bringing into the city for the purpose of sale the flesh of any animal raised by themselves, after market hours."

And the tax ordinance of 1893, as follows:

"Be it ordained by the mayor and council of the city of Macon, and it is hereby ordained by the authority of the same, that the following licenses and special taxes shall be levied and collected in the city of Macon for the year 1893: Butchers and others who have no stall in the market, and who shall sell from shop or wagon, other than nonresidents selling meats of their own raising; and no license shall issue for less than five hundred dollars."

It is true, the tax ordinance excepts from its verbal operation "nonresidents selling meats of their own raising," but, since it is evident that the only persons who can avail themselves of this privilege are nonresidents who live in the immediate vicinity of Macon, it effectually excludes meat producers from all other states. Nor is this conclusion to be avoided merely because this enactment purports to apply alike to the vendors of meat in this state as well as to meats produced in other states, for "the burden imposed by a state upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the states, including the people of the state enacting such statute." Brimmer v. Rebman, supra. The case of Osborne v. Mobile, 16 Wall. 479, which seems to hold a contrary doctrine, has been overruled in later decisions. See Leloup v. Port of Mobile, 127 U. S. 640, 8 Sup. Ct. 1380; Asher v. Texas, 128 U. S. 129, 9 Sup. Ct. 1; Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851.

It follows, also, that the wholesale tax upon the business of meat selling within the city of Macon is void, the evidence showing that this business depends entirely upon the sale of western meats, there being no pretense of imposing a tax on home-made meats sold in bulk.

For the foregoing reasons the defendants must be enjoined from collecting these taxes. Because their regulations are also unconstitutional as imposing an unlawful restriction upon commerce between the states, they must be restrained from enforcing or endeavoring to enforce against the complainants the penalties provided in the ordinances for selling or offering for sale their meats at their regular

places of business, or in the city of Macon otherwise than at the market house, and from selling their meats at any time during market hours, as prohibited in said ordinances; and from collecting or attempting to collect from complainants the license fee fixed by such ordinances for the sale of meats elsewhere than in the market house; and must be further enjoined from preventing the complainants, who have rented stalls at the market house, from selling at the market house as much of their meats as they may have the opportunity to sell, to any and all persons who may there desire to buy. That, in so far as the said market ordinances are intended to support these restrictions, they are unconstitutional and void.

Let the demurrer be overruled. The answer is held insufficient.